J. A11012/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| OBINA ONYIAH, | : | No. 3010 EDA 2013 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, May 31, 2013,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0001632-2011

BEFORE:  FORD ELLIOTT, P.J.E., OLSON AND WECHT, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED SEPTEMBER 28, 2015**

Following a jury trial, Obina Onyiah was convicted of second-degree murder, three counts of robbery, conspiracy to commit robbery, and a violation of the Uniform Firearms Act.  Herein, he appeals from the judgment of sentence entered on May 31, 2013, in the Court of Common Pleas of Philadelphia County.  We affirm.

The facts, as aptly summarized by the trial court, are as follows.

> On Thursday, October 21, 2010, at about 10:30 a.m., William Glatz, Margaret Colbridge, Eric Stiess, and Paul Brewington were all inside the William Glatz Jewelers' store, located at 6435 Rising Sun Avenue.  Mr. Glatz was the owner of this family establishment, which had been in business for about 63 years.  Ms. Colbridge and Mr. Stiess were both long-time employees who had each worked at the store for about 25 years.  On this morning, Mr. Brewington, an outside salesman, had a scheduled appointment to sell jewelry to Mr. Glatz.

Appellant and Kevin Turner entered the jewelry store around 11:00 a.m. on October 21, 2010. They had been in the store days before posing as customers when they were really planning a robbery. On that Thursday, Turner and [appellant] approached Ms. Colbridge and asked her to remove a link from Turner's watch. Ms. Colbridge took the watch to Mr. Glatz, who was in the back room of the store. On her way to the back room, she noticed that Mr. Brewington had left two of his bags in the front of the store. She put one bag over the counter and dragged the other one to the back of the store. [Appellant] and Turner followed her as she entered the back room. In her testimony, Ms. Colbridge referred to the two men as "Fat" and "Skinny." "Fat" was Kevin Turner. "Skinny" was [appellant].

When they reached the back room, Turner approached Mr. Stiess and put a gun to his head. Mr. Stiess complied with Turner's order to drop whatever was in his hand, and dropped his gun on the floor. [Appellant] grabbed Ms. Colbridge and put a gun to her head. However, Ms. Colbridge struck [appellant's] arm, knocked his gun away, and ran for help. As Ms. Colbridge fled, Turner yelled to [appellant]: "Get her, shoot her." [Appellant] chased Ms. Colbridge, but she ran from the store toward the pharmacy to her left, where she asked the attendant to call police. [Appellant] ran across the street, entered a waiting vehicle parked at Argyle and Levick Streets and fled the scene.

Inside the jewelry store, Turner was holding a gun to Mr. Stiess's head. Mr. Brewington had his hands down and his back turned to show that he was not a threat. Turner ordered Mr. Stiess to approach him, and as Mr. Stiess complied with that command, Mr. Glatz reached for his gun. Turner and Mr. Glatz then exchanged gunfire. Turner shot Mr. Glatz four or five times, and Mr. Glatz shot Turner.

During the shooting, a bullet whizzed by Mr. Stiess's head and another bullet nearly struck

Mr. Brewington. When the shooting was over, Mr. Glatz was on the floor gasping and holding his chest. Turner was also on the floor, but moving around with a gun in his hand. Mr. Stiess picked up his gun from the floor and shot Turner in the head. He then took the gun from Turner's hand. Despite their efforts, Mr. Stiess and Mr. Brewington were unable to revive Mr. Glatz. The men called 911 and police arrived within one to two minutes.

At about 10:51 a.m., Police Officers Donna Grebloski and Thomas Morrow responded to a radio call of robbery in progress at a jewelry store at 6435 Rising Sun Avenue. As Officer Grebloski entered the store, she saw Ms. Colbridge standing at the jewelry counter in a hysterical state. Ms. Colbridge told the officers that one of the men had fled from the store and requested an ambulance for Mr. Glatz. Mr. Stiess showed Officer Grebloski his gun and shouted: "I shot him. I shot him." As the officers continued to the rear of the store, they saw Turner lying face down on the floor. Officer Grebloski also observed a gun on top of a table behind Turner. Mr. Glatz was lying on his back on the other side of a table.

Officer Grebloski requested two ambulances and secured the crime scene. The rescue unit did not transport Turner to the hospital because it appeared that his condition was hopeless. Mr. Glatz, who was conscious but unresponsive, was transported to the hospital, where he underwent several medical procedures in an attempt to save his life. However, on October 21, 2010, at 11:40 a.m., Mr. Glatz was pronounced dead at Albert Einstein Medical Center in Philadelphia.

Dr. Samuel Gulino, Chief Medical Examiner, testified at trial as the Commonwealth's expert in forensic pathology. Dr. Gulino concluded to a reasonable degree of medical certainty that the cause of Mr. Glatz's death was one gunshot wound to his abdomen. He also concluded to a reasonable degree of medical certainty that the manner of

Mr. Glatz's death was homicide. Dr. Gulino determined that the bullet entered Mr. Glatz's front abdomen and struck the large intestine, mesentery, pancreas, aorta, and one side of his vertebral column. The bullet lodged in the soft tissues on the left side of his back. This slightly deformed bullet was recovered and submitted to police. Due to damage to the aorta, other organs and blood vessels, Mr. Glatz bled internally and a significant amount of blood was found in his abdominal cavity. Dr. Gulino stated that the blood loss caused Mr. Glatz's heart to stop beating, resulting in death.

Turner sustained two gunshot wounds, including one to the left back of his head administered by Mr. Stiess. A second gunshot wound was located to the left lower back, where the bullet travelled upward, struck his heart and left lung, and lodged in the left front part of his chest. Dr. Gulino concluded that such a wound would not be immediately incapacitating and that an individual would be able to move and speak until significant blood loss caused unconsciousness. In addition to these two gunshot wounds, Turner had one abrasion to the right side of his forehead and a second abrasion on the side of his right eye. Dr. Gulino concluded that these abrasions were consistent with Turner's face striking the floor after he collapsed from being shot.

At 1:50 p.m., Police Officer Christopher Reed responded to the location and processed the crime scene. Officer Reed found a bloody black hat with a red brim embossed with "New Era 59Fifty" and "Cincinnati Reds" in the doorway near Turner's body. Officer Reed also recovered three firearms: one .357 caliber Smith and Wesson revolver owned by Mr. Glatz, one .45 semi-automatic Ruger that had been possessed by Turner, and one .380 Walther owned by Mr. Stiess. The .357 caliber Smith and Wesson revolver contained one 9 millimeter live round and four fired cartridge casings. Officer Reed also recovered five .45 caliber fired cartridge casings, one copper jacket fragment, one copper

projectile, and two other projectiles. He later submitted the ballistics evidence to the Firearms Identification Unit. In addition to finding these fired cartridge casings, Officer Reed also observed several strike marks inside the store.

At trial, the parties stipulated to Police Officer Grandizio's expertise in tool marking firearms identification and ballistics evidence. He examined the submitted ballistics evidence and made the following findings. The .45 caliber semi-automatic weapon fired the five spent cartridge casings. The .380 Walther contained one live round and one fired cartridge casing, and used hydroshock ammunition. The .357 revolver contained four fired cartridge casings and one live round inside the chamber. Further, the Commonwealth introduced a certificate of non-licensure, which confirmed that [appellant] was not licensed to carry a firearm on October 21, 2010.

Officer Reed and other responding officers also dusted the jewelry store display cases for latent fingerprints and submitted them for further processing at the Records and Identification Unit. At trial, the parties stipulated to the latent fingerprint report prepared by Patrick Raytik, a fingerprint technician, who determined that the fingerprints could not be attributed to [appellant], Kevin Turner, or a third man, Jamal Hicks.

Homicide Detectives interviewed Mr. Brewington, Ms. Colbridge, and Mr. Stiess, who each provided a statement wherein they gave an account of what happened inside the jewelry store and a description of the second perpetrator. They also interviewed Suzanne Duffy, who saw the second man flee the crime scene. At approximately 1:45 p.m., Detectives Lucke and Dunlap arrived and recovered surveillance video from three security cameras inside the jewelry store. Based on information that Detective Lucke received from other detectives and witnesses at the scene, he narrowed his search to certain individuals and to the time

periods of October 19, 2010 between 10:30 a.m. and 10:45 a.m., October 20, 2010 between 2:50 p.m. and 3:00 p.m., and October 21, 2010 between 10:30 a.m. and 11:00 a.m.

Detective Lucke compiled the relevant timeframes chronologically into one video. On October 19, 2010, at 10:30 a.m., the video displayed two men entering the store. One of the men was Turner, who was significantly taller and had a bigger build than the other man. The second man was of a thin build, had a medium brown complexion, and was wearing a loose reddish orange hoodie. At 10:39 a.m., the two men are seen exiting the store. On October 20, 2010, at 2:54 p.m., the video showed an individual entering and exiting the store.

The October 21, 2010 video showed Turner and a tall, thin man who appeared close to Turner's height. The tall, thin man, later identified as [appellant], was wearing a dark hat, dark hoodie, dark pants, and white sneakers. The video further showed that Turner pulled out a large dark silver semi-automatic gun and [appellant] retrieved an item from his waistband. It also showed Ms. Colbridge running toward the front door and [appellant] chasing her with a gun in his right hand.

As the above transpired, a cloud of dust, consistent with the exchange of gunfire, appeared in the video. Ms. Colbridge can be seen running left toward the store next door, as [appellant], who chased her, turned right after exiting the jewelry store. Another employee then moved to the front door of the store. The video then showed activity in the back of the store. One man was in the back behind a workstation. Detective Lucke believed that this man was Mr. Glatz, who was shot and killed. Another individual fell to the floor. When Detective Lucke arrived on location, he saw Turner lying on the floor about several feet inside the rear work area.

During Detective Lucke's review of his video compilation, he viewed each frame and identified the clearest one from which to extract a still photograph. The best frame depicted a man wearing a dark hoodie and a dark fitted hat with a dark brim. The man had a brown complexion, full lips, and a slight mustache. He did not appear to have tattoos, piercing, jewelry, or scars. The man carried a dark colored handgun. Detective Lucke extracted a second frame of the man from the same angle. This man was later identified as [appellant].

On October 23, 2010, Raneisha Carter provided a statement to Homicide Detectives after viewing a newspaper article that showed the side profile of a man wearing a hat and a hoodie. Ms. Carter thought that the man depicted in the photograph resembled Donte Waters, her son's father. On the same day that Ms. Carter identified Waters, detectives visited the respective homes of Ms. Colbridge and Mr. Stiess and interviewed them a second time. After being shown a photographic array, Ms. Colbridge and Mr. Stiess each identified Waters, as a man bearing a close resemblance to the perpetrator. This man had similar facial characteristics as [appellant] such as prominent lips and nose and a dark complexion. However, police later determined that Waters was not involved in this incident, and identified [appellant] as the second perpetrator.

At trial, Detective Lucke compared the still photograph that was extracted from the jewelry store surveillance video to a photograph of Donte Waters taken on April 20, 2011. Detective Lucke noted that Waters had a lighter complexion and had distinctive tattoos on his right neck. Detective Lucke stated that those tattoos would have been shown in the surveillance video if Waters had been in the jewelry store. Waters's height was listed as 5 feet 9 inches tall and his weight was 155 pounds. Detective Lucke also compared the still photograph to a photograph of [appellant] taken on November 10, 2010. In the

November 10, 2010 photograph, [appellant]'s height was listed as 6 feet 3 inches and his weight was 195 pounds. Detective Lucke stated that the individuals depicted in the two photographs had similar facial features including the nose, the lips, and complexion.

On November 4, 2010, Donnell Cheek provided a statement to Detectives Cummings and Glenn. Mr. Cheek provided this statement after he saw a still photograph on television news while he was in a Camden County prison. He saw this photograph three (3) times. After he saw this still photograph, he called a friend and asked her to contact the news station. Mr. Cheek also spoke with his attorney. After consulting with his attorney, Mr. Cheek was interviewed by the detectives in this case.[Footnote 1]

> [Footnote 1] On September 29, 2010, Mr. Cheek entered into a federal plea agreement and a cooperation agreement with the United States Attorney's Office. As a result of Mr. Cheek's cooperation in this case, the United States Attorney's Office offered to file a motion to reduce his federal sentence.

During his interview, Mr. Cheek identified [appellant] as the man depicted in the still photograph. Mr. Cheek was shown a second photograph that depicted a man with an afro and a prominent mustache and beard and identified [appellant] as the man depicted therein. At trial, Mr. Cheek testified that he was 100 percent certain of his identifications of [appellant], whom he has known since 1997. Mr. Cheek attended the same school as [appellant] from middle school until the first year of high school, when [appellant] transferred to another school. The two men had been friends during that period and played basketball together. The last time that Mr. Cheek had seen [appellant] was sometime in 2005. From 1997 to

2005, Mr. Cheek had seen [appellant] over 200 times.

On December 20, 2010, Detective Bill Urban conducted a lineup that included five men and [appellant], who was in the Number 4 position. Ms. Colbridge, Mr. Stiess, and Mr. Brewington were present and viewed the lineup. Mr. Brewington could not identify anyone, but he further described the second man as a black male in his 20s who was about 5 feet and 7 to 8 inches tall and had no facial hair and no tattoos. Mr. Stiess immediately identified [appellant]. Ms. Colbridge identified [appellant], stating "I think it was Number 4." Detective Urban considered Ms. Colbridge's statement to be a positive identification of [appellant] because she did not choose anyone else. At trial, Ms. Colbridge confirmed her identification of [appellant].

On November 8, 2010, at 10:10 a.m., Detective Pitts interviewed Chioma Christine Onyiah, [appellant's] sister, at the Homicide Unit. As a result of this interview, Ms. Onyiah arranged for [appellant] to meet her outside a McDonald's near Bridge and Pratt Streets. At about 2:50 p.m., Police Officer Brian Ward detained [appellant] at the intersection of Saul Street and Cheltenham Avenue and transported him to the Homicide Unit.

[Appellant] arrived at the Homicide Unit at about 3:20 p.m. on November 8, 2010. At 10:55 p.m., Detective Pitts took a verbatim statement from [appellant]. During this interview, [appellant] was in good physical condition. He did not appear to be under the influence of drugs or alcohol. [Appellant] appeared to be oriented to time and space, and his answers were responsive. [Appellant] did not appear to be sleepy. He did not request to use the bathroom. He did not request food or drink. [Appellant] spoke English and stated that he could read, write and understand English. There were no threats or promises made to

[appellant] before, during, or after the statement. He was not physically abused in any way.

Before [appellant] provided his statement, Detective Pitts advised him of his **Miranda** rights and informed him that he was being questioned about the robbery at Glatz Jewelry Store and the murder of William Glatz. Detective Pitts and [appellant] then engaged in an informal conversation. Before the formal interview began, Detective Pitts again advised [appellant] of his **Miranda** rights. On the second page of his statement, [appellant] stated that he understood his **Miranda** rights and voluntarily waived them.

In his statement, [appellant] explained that a week prior to the robbery, he was playing basketball with another male named Jamal, who proposed that they rob a store for quick and easy money. [Appellant] agreed and met Jamal in a parking lot near the Frankford Terminal, where he entered the rear passenger seat of a dark green car with tinted windows with Kevin Turner sitting inside. When the two men arrived at the jewelry store, Turner entered first and [appellant] followed.

In his statement, [appellant] further explained what happened inside the jewelry store on October 21, 2010; how he chased Ms. Colbridge and how he fled the scene. [Appellant] also informed police that he discarded the hoodie, jeans and skull cap he wore that day, and that he left the gun in Jamal's car. During this interview, [appellant] identified a photograph of Jamal Hicks. He identified Turner as "[t]he guy in the store with me." At the end of his interview, [appellant] signed the appropriate form to indicate that he declined to have his statement videotaped. On November 10, 2010, at 3:15 p.m., [appellant] was arrested and charged with murder, robbery and related offenses.

On November 16, 2010, at 11:20 a.m., Jeremy Carrion provided a statement to police after he was contacted by the Homicide Unit. At that time,

Mr. Carrion identified [appellant] from the still photographs and news captions from the Internet. Mr. Carrion also identified [appellant] at trial and noted that [appellant] looked the same as he did the last time that they met. Jeremy Carrion knew [appellant] in a professional capacity from March 2009 to July 2010. During that time, he met with [appellant] once or twice per month for anytime between five (5) minutes to one (1) hour in standard lighting conditions. In fact, Mr. Carrion was [appellant's] probation officer, but that fact was not disclosed to the jury.

On February 9, 2011, Ms. Colbridge identified [appellant] at his preliminary hearing. At trial, she confirmed her prior identifications of [appellant]. Mr. Stiess also identified [appellant] at the preliminary hearing and at trial. Mr. Brewington did not testify at [appellant's] preliminary hearing. At trial, he identified [appellant]. He explained that he was able to make this identification after he independently viewed videotapes of the incident.

Trial court opinion, 5/30/14 at 2-12 (citations to the record omitted).

Appellant filed a motion to suppress his confession, contesting the voluntariness of his confession; the Honorable Sandy L.V. Byrd denied the motion, and a jury trial commenced on May 23, 2013. On May 31, 2013, appellant was convicted of the above-stated offenses. Appellant was sentenced to life in prison without parole. A post-sentence motion was timely filed; on October 8, 2013, the motion was denied. A timely notice of appeal was filed. Appellant complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion. Thereafter, on January 15, 2014, appellant filed a motion for remand due to

newly discovered evidence; a panel of this court denied the motion without prejudice to appellant's right to re-apply for such relief in appellant's brief.

The following issues have been presented for our review.

> I. Were the verdicts of guilty as to 2nd degree murder, three counts of robbery, conspiracy to commit robbery and carrying a firearm without a license against the weight of the evidence?
>
> II. Did the trial court err in not striking the testimony of Paul Brewington identifying the appellant as one of the perpetrators of the crimes?
>
> III. Did the trial court err in allowing the witnesses Jeremy Car[r]ion, Donnel [Cheek] and Detective Thurston Lucke to give their respective opinions that the pictures taken f[ro]m the surveillance video of the incident were pictures of the appellant?
>
> IV. Is the [appellant] entitled to an evidentiary hearing because of newly discovered evidence that Detective Pitts and Detective Jenkins, the Detectives who secured the alleged confession from the appellant had one [sic] three previous occasions coerced statements from murder suspects?

Appellant's brief at 2.[1]

Appellant first challenges the weight of the evidence. Specifically, appellant argues he should be awarded a new trial because the evidence establishing his identity was vague, conflicting, contradictory, and

---

[1] Additional issues contained in his Rule 1925(b) statement have not been presented by appellant to our court in his brief; hence, we deem them to have been abandoned.

impeached. (Appellant's brief at 12.) The Commonwealth asserts that the record reveals appellant has failed to raise this claim before the trial court pursuant to Pa.R.Crim.P. 607. We disagree. A review of appellant's post-trial motion reveals that the second issue therein challenges the weight of the evidence. (Docket #12.)

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis omitted) (citations omitted).

Appellant avers that he is 6'3" tall; he argues that because eyewitnesses described a shorter person and the video surveillance depicted a shorter person, it was physically impossible for him to have been the individual in the store with Turner. Appellant, however, ignores his own confession and other identification testimony introduced by the Commonwealth.

Appellant presented this argument to the jury, and the Commonwealth addressed the apparent discrepancies as to appellant's height. (Notes of

testimony, 5/31/13 at 63-73.)  The trial court provided an instruction to the jury regarding how to evaluate identification testimony.  (*Id.* at 127-129.)  Here, the jury obviously accepted the version of the facts presented by the Commonwealth's witnesses.  For instance, Brewington testified that his statement to the police regarding appellant's height of approximately 5'7" or 5'8" was a "guesstimate"; Brewington also testified that his identification of appellant did not waver upon knowing appellant was 6'3".  (Notes of testimony, 5/28/13 at 243-245.)  Certainly, the jury's verdict does not shock one's sense of justice.  The trial court did not abuse its discretion in denying appellant's motion for a new trial based on the weight of the evidence.

Next, appellant claims that the trial court abused its discretion in refusing to strike the testimony of Paul Brewington, who failed to identify appellant at the line-up but identified him at trial.  (Appellant's brief at 14.)  On cross-examination, Brewington testified he was able to identify appellant after watching a YouTube video that contained footage of the robbery that jogged his memory.  Appellant argues that Brewington's testimony violated the "best evidence rule" because the video Brewington watched was not admitted into evidence.

Our standard of review is well settled.  Questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. ***Commonwealth v. Freidl***, 834 A.2d 638, 641 (Pa.Super. 2003).  The best

evidence rule is embodied in Pa.R.E. 1002, which provides: "An original writing, recording, or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise."

In the present case, the rule was inapplicable because the Commonwealth never attempted to establish the contents of the videotape, and Brewington did not testify as to the contents of the video. Rather, Brewington's identification was based on his direct observation of appellant during the robbery. *Compare Commonwealth v. Lewis*, 623 A.2d 355 (Pa.Super. 1993) (under best evidence rule, police officer who did not view crime of retail theft was prohibited from testifying about what he observed on the videotape of incident since that tape was best evidence of what transpired), with *Commonwealth v. Steward*, 762 A.2d 721, 723 (Pa.Super. 2000) (best evidence rule was inapplicable where "witness observed the theft himself and did not rely on the videotape" in describing the incident).

Here, Brewington personally observed and testified about appellant's actions, and the best evidence rule was not offended. "An opportunity to observe, even for a limited moment, can form an independent basis for an in-court identification[.]" *Commonwealth v. Baker*, 614 A.2d 663, 669 (Pa. 1992). Thus, although Brewington saw appellant for a brief moment, he had sufficient time to view appellant during the commission of the crime.

The video merely jogged his memory of the events he had witnessed, and he was able to identify appellant at trial.

Furthermore, we agree with the Commonwealth that appellant could not have been prejudiced by any such error. The Commonwealth has the burden of establishing that an error is harmless beyond a reasonable doubt. *Commonwealth v. Story*, 383 A.2d 155 (Pa. 1978). "[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict." *Id.* at 164. An error is harmless where:

> (1) the error did not prejudice the [appellant] or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Foy*, 612 A.2d 1349 (Pa. 1992) (citations omitted).

In the case *sub judice*, we find any such error would have been *de minimis*. Defense counsel aggressively attacked Brewington's identification testimony, and the court instructed the jurors to view it with caution. The overwhelming evidence against appellant included his own confession, the testimony of two other eyewitnesses, and the surveillance video that captured the robbery. We cannot find that the outcome would have changed if Brewington's testimony had been stricken.

The third issue presented is whether the trial court abused its discretion by allowing two people who knew him to identify him as one of the robbers in the surveillance video. We find no error with the trial court's holding. After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that there is no merit to the questions raised on appeal. The trial court's opinion, filed on May 30, 2014, comprehensively discusses and properly disposes of the question presented, and we affirm on that basis. (**See** trial court opinion, 5/31/14 at 16-18.)

In his final claim, appellant asserts that Detective Pitts and Detective Jenkins, the detectives who secured the alleged confession from appellant, had on three previous occasions coerced statements from murder suspects. Appellant seeks a remand to the trial court for a hearing on alleged after-discovered evidence under Pennsylvania Rule of Criminal Procedure 702(C), which we assume reflects a transposition of digits, and that appellant, in fact, intended to cite Rule 720(C).

Rule 720(C) provides that "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing **promptly after such discovery**." (Emphasis added.) We have held that such a claim may be raised for the first time on direct appeal. **Commonwealth v. Rivera**, 939 A.2d 355, 358 (Pa.Super. 2007). We conclude, however, that appellant's proffer is insufficient to warrant a remand.

- 17 -

> The four-prong test for awarding a new trial because of after-discovered evidence is well settled. The evidence: (1) could not have been obtained prior to trial by exercising reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach a witness's credibility; and (4) would likely result in a different verdict.

***Commonwealth v. Castro***, 93 A.3d 818, 821 n.7 (Pa. 2014).

Appellant's assertions are insufficient to meet the benchmarks necessary to warrant a new trial based upon after-discovered evidence. Appellant neglects to explain <u>when</u> he obtained the information alleged or how he could not have obtained the evidence prior to trial by exercising due diligence. Appellant does not explain any time-frame regarding when Nafis Pinkey, Amin Speaks, or Unique Drayton's cases were decided. Thus, we cannot find that appellant has complied with the prompt filing requirement. ***C.f. Commonwealth v. Trinidad***, 90 A.3d 721 (Pa.Super. 2014) (defendant's post-sentence motion based on alleged newly discovered evidence was filed promptly after discovery of the evidence where defendant filed post-sentence motion within seven days of receiving an affidavit from a witness stating that he was a witness to the crime and had exculpatory evidence to offer on behalf of defendant).

J. A11012/15

Judgment of sentence affirmed.

Judge Wecht joins the Memorandum.

Judge Olson concurs in the result.


*Judgment Entered.*

*Joseph D. Seletyn, Esq*
*Prothonotary*

*Date: 9/28/2015*

- 19 -